The **MANHATTAN LIFE INSURANCE COMPANY**, Appellant,

v.

Elizabeth B. **HARKRIDER**, Appellee.

No. 11322.

Court of Civil Appeals of Texas.

Austin.

Nov. 3, 1965.

Rehearing Denied Dec. 1, 1965.

Coleman Gay, Austin, for appellant.

Gaynor Kendall, Austin, for appellee.

PHILLIPS, Justice.

Elizabeth B. Harkrider, plaintiff-appellee, brought this suit against Manhattan Life Insurance Company, defendant-appellant,[1] to collect the $10,000 face amount of a policy of life insurance which defendant sold to her late husband, Rupert R. Harkrider (hereinafter called the insured) on his life, with plaintiff as beneficiary; and, the defendant having refused to pay the claim for more than thirty days after demand and proof of loss, to recover also interest on the amount due, together with the statutory penalty, attorneys' fees and costs of suit.

The insurance company sought to avoid the policy on the ground that the insured

1. The parties will hereafter be referred to according to their designations in the trial court.

had knowingly made material misrepresentations in the application for insurance, and that such misrepresentations were "made willfully and with the fraudulent intention of deceiving defendant and inducing it to issue the policy * * *" Specifically, it was contended by the defendant that the insured had made false and fraudulent answers to question number 6 and to question 7(k) in the application for insurance. These questions and the answers of the insured thereto, were as follows:

"6. Have you had any health examinations or check-ups in the past five years? (If so, state symptoms which prompted the examination, give physician's diagnosis and recommendations, also name and address.)         Yes or No     No

7. Within the last 10 years, have you had or been told you had or been treated for: * * *

(f) High blood pressure? When? What drugs and dosage were used? * * *      Yes

(k) Any other disorer, injury or impairment?      No"

In the column adjacent to question 7(f), the insured gave 1961 as the date of the high blood pressure, and "serpasil .25 mgm t.e.d." as the medication prescribed.

Trial was to a jury on special issues, in response to which the jury made the following findings regarding question 6 in the insurance application:

(a) That "at the time he signed his application for insurance Rupert R. Harkrider knew that his answer to Question No. 6 was false;"

(b) That Rupert R. Harkrider did not make "his answer to question 6 * * * with the intent to deceive and mislead the defendant into issuing said policy of insurance."

(c) That Rupert R. Harkrider did not answer Question No. 6 "for the purpose of wrongfully inducing The Manhattan Life Insurance Company to issue the policy"; (the Court at defendant's request having defined the term "wrongfully inducing" as meaning "the concealment or misstatement of facts as an inducement to issue a policy of insurance, which policy would not have been issued if such facts had not been concealed or misstated." and

(d) That the answer to Question No. 6 was not "material to the risk."

Regarding insured's answer to Question 7(k) of the application, the jury found:

(a) That at the time he signed the application, Rupert R. Harkrider did not know that his answer to Question 7(k) was false;

(b) That he did not make his answer to the question "with the intent to deceive and mislead the defendant into issuing said policy of insurance;"

(c) That he did not answer Question 7(k) "for the purpose of wrongfully inducing The Manhattan Life Insurance Company to issue the policy;" and

(d) That the answer to question No. 7(k) was not "material to the risk."

The jury also found that the defendant had relied on insured's answers.

On the basis of the jury's verdict, the District Court entered judgment for plaintiff, overruling defendant's motion for judgment non obstante. The defendant has appealed to this Court, and has filed a brief containing twenty points of error, of

which seven (Appellant's Points 2–8) [2] attack the jury's findings on the ground that there is "no evidence" to support the answers to Special Issues 2, 3, 5, 11, 12, 13 and in consequence that the Court erred in overruling defendant's motion for judgment non obstante (Point I) ; [3] and seven more points of error assert that the answers of the jury to those same issues are so greatly against the preponderance of the evidence as to be clearly wrong (appellant's Points 14–20).[4]

Finally, defendant-appellant argues that the trial court should not have submitted Special Issues 2, 3, 12 and 13 in the form submitted but that in lieu of those issues the Court should have given defendant's Requested Special Issues 1 and 2 (Appellant's Points of Error 9–13).[5]

2. "2nd Point of Error: The error of the court in holding that there was any evidence to support the jury's finding that insured's admittedly false statement that he had not had a physical examination within the preceding 5 years was not 'material to the risk.'

3rd Point of Error: The error of the court in holding that there was any evidence to support the jury's finding that the insured's statement in his application that he was not under treatment for any disorder or impairment except high blood pressure was not 'material to the risk.'

4th Point of Error: The error of the court in holding that there was any evidence to support the jury's finding that applicant's denial that he had had a recent physical examination was not made with intent to deceive and mislead appellant.

5th Point of Error: The error of the court in holding that there was any evidence to support the jury's finding that applicant's misrepresentation as to medical treatment he was then receiving was not made with intent to deceive and mislead appellant.

6th Point of Error: The error of the court in holding that there was any evidence to support the jury's finding that applicant's denial that he had had a recent physical examination was not made for the purpose of wrongfully inducing appellant to issue the policy.

7th Point of Error: The error of the court in holding that there was any evidence to support the jury's findings that applicant's misrepresentation as to medical treatment he was then receiving was not made for the purpose of wrongfully inducing appellant to issue the policy.

8th Point of Error: The error of the court in holding that there was any evidence to support the jury's finding that Mr. Harkrider did not know that his answer to Question No. 7(k) was false."

3. "1st Point of Error: The error of the court in overruling defendant's motion for judgment notwithstanding the verdict."

4. "14th Point of Error: The error of the court in holding that the jury's answer to Special Issue No. 5 was not so greatly against the preponderance of the evidence as to be clearly wrong.

15th Point of Error: The error of the court in holding that the jury's answer to Special Issue No. 2 was not so greatly against the preponderance of the evidence as to be clearly wrong.

16th Point of Error: The error of the court in holding that the jury's answer to Special Issue No. 3 was no so greatly against the preponderance of the evidence as to be clearly wrong.

17th Point of Error: The error of the court in holding that the jury's answer to Special Issue No. 3 was not so greatly against the preponderance of the evidence as to be clearly wrong.

18th Point of Error: The error of the court in holding that the jury's answer to Special Issue No. 12 was not so greatly against the preponderance of the evidence as to be clearly wrong.

19th Point of Error: The error of the court in holding that the jury's answer to Special Issue No. 13 was not so greatly against the preponderance of the evidence as to be clearly wrong.

20th Point of Error: The error of the court in holding that the jury's answer to Special Issue No. 15 was not so greatly against the preponderance of the evidence as to be clearly wrong."

5. "9th Point of Error: The error of the court in overruling defendant's objection to Special Issue No. 2 as requiring it to show an intent to deceive and mislead insurer by making the false statements, even though the law requires only that the statement be made with the intent that it induce the issuance of policy.

10th Point of Error: The error of the court in refusing to submit Defendant's

We overrule these points and affirm the judgment of the trial court.

The insured, Rupert R. Harkrider, was 53 years of age in the spring of 1962. He was a graduate of the University of Texas Law School and had been a lawyer in Abilene and Beaumont before moving to Austin nine years previously. He had not practiced law in Austin, but was in the cattle business, had some stocks, owned rent property, and was taking care of his own properties and business.

After the Harkriders came to Austin, they became close friends of Dr. A. H. Neighbors, Jr., and his family, who lived in the same block; they visited socially; their children stayed at one another's houses; and this relationship had existed for upwards of seven years. Dr. Neighbors became the family physician of the Harkriders, and had seen Mr. Harkrider on three or four occasions professionally. Dr. Neighbors testified that he first saw Harkrider professionally in December of 1960, and at that time

"He wanted me to check his blood pressure and see how he was doing, and he had some high blood pressure, and I put him on some medicine and told him that I needed to check him again."

The blood pressure condition was what Dr. Neighbors classed as "borderline" in the sense of being barely above normal readings, but he prescribed Serpasil for the condition.

Requested Special Issue No. 1, inquiring whether Mr. Harkrider denied that he had recently had a physical examination for the purpose of inducing appellant to issue the policy.
11th Point of Error: The error of the court in overruling defendant's objection to Special Issue No. 12 as requiring it to show an intent to deceive and mislead insurer by making the false statements, even though the law requires only that the statement be made with the intent that it induce the issuance of policy.

Mr. Harkrider was only 5 feet 4-¾ inches tall, but then weighed 168 pounds. About December 1961, at Dr. Neighbors' suggestion, he went on a diet to lose weight, and continued the diet until May 30, 1962. The doctor had told him if he would lose some weight, it would add ten years to his life.

The blood pressure condition was the only medical problem for which he consulted Dr. Neighbors.

The above was the status in April 1962, with Mr. Harkrider still on the diet and still taking Serpasil for the blood pressure condition when the matter of insurance came into the picture. The evidence reveals that Mr. Harkrider already owned some life insurance and in prior years he had been declined a policy by one company and was offered (but declined) a rated-up policy by another, both on account of high blood pressure. But he did not originate the negotiations which ripened into the policy in suit. Instead, Mr. Nolan, agent for Southwestern Life, testified that in April 1962, Southwestern made a special offer to encourage its agents to call on its present policyholders, by proposing to write up to $5,000 additional insurance for any such policyholder, without requiring a medical examination, but simply on a medical history to be obtained from the policyholder by the agent. Mr. Nolan testified he "had been talking to Mr. Harkrider for several years about some additional insurance, and when this offer came out, I suggested to him that it might be a good thing for him to take advantage of it." Harkrider waited

12th Point of Error: The error of the court in refusing to submit Defendant's Requested Special Issue No. 2, inquiring whether Mr. Harkrider answered 'No' to Question No. 7(k) of the application for the purpose of inducing appellant to issue the policy.
13th Point of Error: The error of the court in overruling defendant's objection to Special Issue No. 3 because of the use of the word 'wrongfully' therein."

until the last day the offer was open before he decided to make application to Southwestern for the additional $5,000 policy. Mr. Nolan was sure that Harkrider revealed to Southwestern "that he had been going to Dr. Neighbors for a history of hypertension" because Nolan received and had in his files copies of the correspondence between Southwestern and Dr. Neighbors where they asked the doctor for Harkrider's medical history. "The result (of this application) was that due to his history of elevated blood pressure, the Company (Southwestern) preferred to decline the application" and so notified Harkrider and the agent under date of May 25, 1962.

Mr. Nolan testified that upon receipt of notice that Southwestern had declined the policy, he got in touch with Mr. Daniels, the general agent at San Antonio for the defendant Manhattan Life Insurance Company, because it was known as one specializing in substandard risk or extra-premium business; he told Daniels about Harkrider's situation, and asked if Manhattan would consider writing the policy, and at what rate. Mr. Daniels told him to get "a preliminary application form filled out" along with a permission letter authorizing Manhattan to write Harkrider's doctor. This Nolan did, and mailed the two instruments to Mr. Daniels on May 28, 1962.

Next in chronological sequence is the fact that on May 30, 1962, Mr. Harkrider went to Dr. F. M. Pearce, Jr. and had a physical examination, the denial of which in answer to Question 6 is the basis of the claim by defendant of fraudulent misrepresentation on the part of insured. The testimony of two witnesses, Mrs. Harkrider and Dr. Pearce, related (in part) to this event.

Mrs. Harkrider testified that on May 30, 1962, she and her husband went to Dr. Pearce to get a physical check-up. Asked by defendant whether they regularly got a check-up, she testified "We tried to, but you don't always do it." At any event, it had been quite some time since either had been

for a general physical, and she wanted them both to go for a physical examination. She could not recall that there was anything about her own physical condition which caused her to decide to go for a check-up. She could not recall that either had not been feeling well. But they had teen-aged children, and with these responsibilities she wanted to be sure they were in good health. The reason Mr. Harkrider went was that she asked him to go. As to whether there was anything about his condition which prompted her to ask him to go, she testified that he had had high blood pressure and she was concerned about that; she thought he was not up to par; he had been on the diet at the doctor's suggestion and had lost a good bit of weight; he had not complained of being sick, but "I don't think he was as strong as he would like to be, and that I attributed to his loss of weight." The only complaint he had ever mentioned was that his left arm seemed to be weak, and she had chided him about it that it made no difference anyway.

Dr. Pearce testified that Mr. Harkrider came to him on May 30, 1962 "primarily for a physical check-up and for examination in regard to his blood pressure" and "He did not specifically complain of any other illness." "He came primarily for just a general check-up," but "He wanted advice as to his blood pressure, whether he needed medication for blood pressure. He also mentioned that he would like to have some advice as to—as regards what type of exercise he should take, just a general question for a man his age. He stated that he had been nervous for a number of years, and wanted advice in regard to his nerves. He said * * * that on an insurance examination which another doctor had given him, that his blood pressure had been found to be elevated, and he had been given some Serpasil. That is a medication for blood pressure." "He had also previously been told to lose weight by his previous physician, * * * and he stated that he had been on a very strenuous diet for the same. He stated his previous weight was 168

pounds, and that he had been on this diet, lost down to 138 pounds, and that he had stabilized at that particular weight, but he had noticed as he has lost the weight he had become weak, and he felt somewhat short of breath and had a slight cough. He had developed a postnasal drip, and he wondered if he had lost too much weight. Next, I mentioned again that he stated he was quite nervous, but that he slept good, and that he had a fairly good appetite. He had no chest pain. At times, his legs and fingers felt stiff. Occasionally he had a few cramps in the feet. He stated he thought his heart was good."

Dr. Pearce testified that he interrogated Harkrider at length inquiring about the different systems of the body, and that Harkride responded as follows:

"He stated that his health previously had been excellent. He denied any other serious diseases or injuries aside from the fact that he had broken his left arm as a child, and as a result this arm was slightly smaller. And he had had no operations. He stated that he had had malaria in the service, but apparently this was cured without any difficulty. He stated that he thought he smoked too much, and he stated that he only drank coffee in the mornings. He thought maybe he drank a little too much."

Thereupon, on May 30th Dr. Pearce made an exhaustive physical examination of Mr. Harkrider, including chest X-ray, urinalysis, blood chemistry, etc., all of which were normal, with the following exceptions. He found the blood pressure readings on that examination (132/110 in left arm, 130/106 in right arm) "as indicative of a slight elevation in blood pressure." He found a slight elevation in the blood count, and the X-ray revealed what "looked like an old scar * * * probably sixty per cent of people in that age group (have) had a very mild case of tuberculosis at some time in their life." [A subsequent X-ray confirmed the scar to be "an old process that has nothing to do with his present state of health"].

Dr. Pearce also noticed during the examination "that there were quite a few fasciculations of muscle groups. These are little shimmering muscle groups that you have to look close to see, and at the time I inquired of Mr. Harkrider if he had ever noticed these, and he had not himself noticed them * * *." And Dr. Pearce noted that Mr. Harkrider did appear nervous and hyperactive.

Dr. Pearce testified that Harkrider returned the following day (May 31) for a report on the examination. Asked to relate what he told Harkrider, Dr. Pearce testified: Harkrider was told about the old scar shown in the X-ray, and that they would later want to reinvestigate it to be sure; he was told that "his blood count was a little above normal." Dr. Pearce first said "I told him I might need to check the thyroid again in the future," but he later testified that his notes on the point were not clear, and he may not have mentioned rechecking the thyroid. Continuing, Dr. Pearce testified:

"I told him that I was not able to diagnose any definite organic disease. I did say that his diastolic blood pressure was running a little above normal, but this is the kind of thing I would have to take the blood pressure on a number of times in the future before I would make any opinion on whether he actually needed treatment for same or not."

To the inquiry whether the above was all Harkrider was told about his condition as revealed by the physical examination, Dr. Pearce testified:

"I think that's—I told him he appeared to be nervous. He appeared to be run-down. He had probably lost too much weight, and if he had drunk excessively, this might have been a factor in making him feel weak. That pretty well covers what I mentioned to him on the first examination."

Continuing with what Harkrider was told (as distinguished from what he was not

told), Dr. Pearce was asked to relate what advices and prescriptions he gave to Harkrider on that date (May 31), and he testified that he told Harkrider:

"* * * that I would advise him to cut down on his cigarettes, and told him to try to stay under a pack a day, and later on I made a note that we should probably try to have him quit smoking. I wanted him to cut down on the alcohol intake by at least a half, and then later on he should cut down on that, even, as his nerves felt better."

Dr. Pearce gave Harkrider some Choledyl, "a kind of test drug I was using myself" which might help relieve the sensation of shortness of breath; he was advised to continue to take the Serpasil which had been prescribed by Dr. Neighbors, "and he was given Librium, which is a tranquilizer * * * to be taken for nervous tension, and I finally advised him to eat better, to eat and put on some weight."

In sum, on the first visit he did not tell Harkrider, "You are in good health," but neither did he tell him "You are in bad health;" instead:

"I told him the things you might tell anybody, cut down on the drinking, cut down on the smoking."

And he told Harkrider to stop the diet: "If he had lost that much weight in a short period of time, it could make him weak, make him feel bad. If he had been used to 168 pounds, and suddenly went down to 138, it could make him feel a little off-key."

What Dr. Pearce did not tell Harkrider is also significant. As previously related, Dr. Pearce noticed fasciculations or shimmerings in certain muscle groups, and he inquired of Harkrider whether he had ever noticed them. Harkrider had not, "and he inquired of the significance of these" muscle tremors, but Dr. Pearce did not tell him they had or might have any significance, because "the fasciculation or jumping of the muscles is seen in amyotrophic lateral sclerosis," and "it is seen in quite a few different diseases, and it could be seen in normal people, too." So, despite Harkrider's inquiry, Dr. Pearce did not tell Harkrider that the fasciculations had or might have any possible significance: "as I have mentioned earlier, he was a high-strung type fellow, and a patient like that, if you just unload all of the possibilities in the world, why it is really hard on them."

So, the only illness discussed on May 30–31 was high blood pressure; and Dr. Pearce told Harkrider to follow the advices above related, and to come back some time later.

As a continuation of the discussions between the witness Mr. Nolan (an Austin insurance man) and Mr. Joe Daniels (Manhattan's general agent in San Antonio), Mr. Daniels on or about June 6, 1962 proposed to Nolan a policy for Harkrider for "which they would charge an extra premium because of his history of elevated blood pressure." After some further discussions between Nolan and Daniels, "we then had Mr. Harkrider examined."

The physician to whom Harkrider was sent for the June 16th insurance medical examination was Dr. A. H. Neighbors, Jr., his friend and neighbor, the same doctor who had originally diagnosed Harkrider's high blood pressure condition, and had prescribed the medication for it, and had suggested the diet, as above related. Dr. Neighbors propounded to Harkrider the questions in the Manhattan Company's application, including the question as to whether the insured had had any health check-ups in the past five years, and whether he had had, or been treated for listed diseases or any not listed; and he wrote down the answers given by the applicant.

On the basis of the medical examination made by him on June 16th, Dr. Neighbors testified that he considered Harkrider to be insurable; indeed, "I thought Mr. Harkrider was in better physical condition than I had ever seen him."

The application was dated June 16, 1962, was signed by Harkrider, the report of

the medical examination signed by Dr. Neighbors, and on June 18th, Mr. Nolan mailed the application to Manhattan in San Antonio. The application did not have the amount of insurance applied for filled in, nor the rate filled in, because Manhattan had not yet informed Nolan how much insurance it would write on Harkrider, nor the rate.

Mrs. Harkrider testified that after the May 30th physical, her husband tried to follow Dr. Pearce's instructions: he quit the diet, and started to eat more and gain a little weight; he had been on the swimming team while in school, and he took up swimming again for exercise; he tried to cut down on his smoking, and otherwise "tried to follow the doctor's directions."

On June 19th, Harkrider reported back to Dr. Pearce. On that second visit, Dr. Pearce took Harkrider's blood pressure, and found it normal; he tested Harkrider for reflexes, and found "no pathological reflexes" or abnormal reflexes, and he further tested him neurologically "checking how well he could stick his finger to his nose, whether his coordination was good, and it seemed to be all right." Dr. Pearce made himself a note that the fasciculations were less; but that Harkrider held his head forward, and that his shoulder strap muscles looked atrophic. So he recorded, in this note to himself, to investigate later whether "this could be an atypical amyotrophic lateral sclerosis," but again he did not tell Harkrider anything at all about these suspicions. Instead, the blood pressure being normal, he told Harkrider to "stop the blood pressure medicine" (Serpasil). Harkrider had theretofore taken the several Choledyl tablets Dr. Pearce gave him on the first visit, and Dr. Pearce did not suggest taking them any more. He also told Harkrider "to keep his Librium (for nervousness) the same, and further cut his smoking and further cut his drinking, which he said he had done, and I told him to call me in two weeks."

Dr. Pearce did not see or hear from Harkrider again until August 27th. But he testified that at no time prior to September 25, 1962, did he diagnose any illness in Harkrider, except the blood pressure condition. And except for mentioning that the lung scar should be rechecked, and that he would later take another blood count, Dr. Pearce also testified that prior to September 25th he had not told Harkrider anything which would have indicated to Harkrider any suspected illness, other than high blood pressure.

During the first week in July 1962, Manhattan mailed to Mr. Nolan a policy for $10,000 on Harkrider's life, rated up so as to charge $885.00 per year premium for five years, and $535.80 thereafter. This was accompanied "with a little form" Harkrider was to sign: this was the "Amendment to Application" in which no blanks are filled in, but signed by Harkrider under date of July 3, 1962, immediately following policy form proper. It contained no inquiries about Harkrider's health. On July 9, Harkrider brought Mr. Nolan a check for the first year's premium, and Nolan delivered the policy to Harkrider.

Harkrider died of amyotrophic lateral sclerosis on December 19, 1962. This disease was definitely diagnosed by Dr. Pearce on September 25, 1962.

I.

■ In order to void a policy of life insurance in this State there are five elements that must be established. These are: the making of the representation, the falsity thereof, reliance thereon by the insurer, the intent to deceive on the part of the insured in making same and the misrepresentation must be material. These elements are stated in General American Life Insurance Company v. Martinez, Tex. Civ.App., 149 S.W.2d 637, error dismissed, judgment correct. In Martinez the Court further states: "Without the concurrence of each and every one of the factual elements above set forth, a misrepresentation

does not constitute a cause of action for the cancellation of the policy, and it is not a valid defense to liability." The Court also stated that: "An immaterial misrepresentation, even though fraudulently made, that is, with knowledge of its falsity and with intent to deceive, does not defeat recovery on the policy. Likewise, a material misrepresentation does not defeat recovery if innocently made; that is, without intent to deceive." American Central Life Insurance Company v. Alexander, Tex.Com. App., 56 S.W.2d 864.

■ In affirming the judgment of the trial court we hold that the defendant (appellant) has not established two of the above-mentioned elements, that is, the elements of materiality and that of intent to deceive on the part of the insured in making the misrepresentations complained of. We also hold that there was sufficient evidence for the jury to have found said elements wanting. We further hold that the lack of either element is fatal to appellant's defense to the policy.

II.

Article 21.16 of the Texas Insurance Code, V.A.T.S. is as follows:

"Any provision in any * * * policy of insurance * * * which provides that the answers or statements made in the application * * *, if untrue or false, shall render the contract or policy void or voidable, shall be of no effect, and shall not constitute any defense to any suit brought upon such contract, unless it be shown upon the trial thereof that the matter or thing misrepresented was material to the risk or actually contributed to the contingency or event on which said policy became due and payable, and whether it was material and so contributed in any case shall be a question of fact to be determined by the court or jury trying such case."

■ Plaintiff (appellee) made out a prima facie case by proving up a valid life insurance policy held by the deceased. She proved that she was the beneficiary and after presenting evidence as to attorney's fees, rested. The burden of invalidating the policy was upon the defendant (appellant). The defendant failed to do so.

Appellant complains here of the error of the trial court in holding that there was any evidence to support the jury's finding that the false statement made by insured that he had not had a physical examination within the past five years was not material to the risk. After reviewing the entire record in this case we have concluded that there are several inferences that the jury could have drawn from the testimony presented at trial, either one of which is evidence and sufficient evidence to support their finding in this regard.

It must be borne in mind that when the deceased insured made the misrepresentation complained of he had been examined by two physicians, neither of whom had found anything wrong with him other than the high blood pressure which was disclosed at all times to all concerned. Thus had the undisclosed examination by Dr. Pearce come to defendant's attention before the issuance of the policy, there is reason to believe that the policy would have been issued anyway. On the day that the form in question was filled out Dr. Neighbors had examined the deceased and pronounced him in excellent health. Dr. Pearce testified that he had not diagnosed the disease in the deceased insured until September 25, 1962 and he was unwilling to testify at the trial that the deceased had the disease when he examined him on May 30, 1962. So the inferences arising with respect to what deceased's doctors might have informed the company of had they been contacted are (a) nothing other than high blood pressure or (b) even though one suspected the disease in question he would not have had enough medical evidence at that time to have mentioned it to the company.

The defendant offered a senior life underwriter of their company as a witness who testified what he would have done had the deceased answered the inquiry about prior examinations truthfully. This testimony was to the effect that he would have contacted Dr. Pearce and that under no conditions would the company have insured a person with amyotrophic lateral sclerosis. But this witness was never asked what he would have done had the deceased insured answered the question truthfully, then had gone on to explain that all that Dr. Pearce had found wrong with him was the high blood pressure. The jury had a right to infer that, had this been done, the company would have approved the policy without having contacted Dr. Pearce, or they could have disregarded the testimony of this interested witness altogether. See this Court's opinion in Bankers Standard Life Insurance Company v. Atwood, Tex.Civ. App., 205 S.W.2d 74.

Likewise we overrule appellant's point of error complaining of the court's holding that there was any evidence to support the jury's finding that the insured's statement in his application that he was not under treatment for any disorder or impairment except high blood pressure was not material to the risk. At the time that the deceased insured filled out the questionnaire in question he had never been told that he had anything other than high blood pressure. Dr. Pearce testified that the medicines he has prescribed were not for amyotrophic lateral sclerosis. There is ample evidence to uphold the finding of the jury in this respect and also to their finding that the deceased had not answered this portion of the questionnaire untruthfully. The deceased could well have believed the medicines prescribed by Dr. Pearce were for the high blood pressure.

We overrule appellant's "no evidence" and "insufficient evidence" points regarding the jury's findings as to the materiality of the answers in question.

III.

Appellant assigns error to the court in holding that there was any evidence to support the jury's findings that the deceased applicant's denial that he had had a recent physical examination was not made with an intent to deceive and mislead appellant. Also appellant assigns error to the holding of the court in holding that there was any evidence to support the jury's findings that applicant's misrepresentation as to medical treatment he was then receiving was not made with intent to deceive and mislead appellant. We overrule both of these points and also the same points relating to the insufficiency of the evidence.

As stated earlier in this opinion, the jury found that the deceased insured did not give an erroneous answer to Question 6 of the insurance application, either with the intent to deceive and mislead the company into issuing the policy or for the purpose of wrongfully inducing the company to issue the policy. It likewise found that he did not know his answer to Question 7(k) was false and that he did not make his answer thereto with the intent to deceive and mislead the company into issuing the policy, or for the purpose of wrongfully inducing the company to issue the policy. Questions of intent such as these are fact questions for the jury, Great Southern Life Insurance Co. v. Doyle, 136 Tex. 377, 151 S.W.2d 197.

Doyle also holds that before the defense of misrepresentations of material facts may be maintained, it is necessary, not only to prove that the representations were false, but also that they were made with intent to deceive or defraud.

Appellant maintains that Doyle is no longer the law in this respect and had been superseded by the opinion of the Supreme Court in Allen v. American National Insurance Company, 380 S.W.2d 604. That under Allen it is sufficient for a misrepresentation such as that at bar to have been made

for the purpose of inducing the company to issue the policy. We cannot agree with appellant here. Allen cites Doyle with approval and other cases with similar holdings on this point.

It should be noted at the outset that the ultimate question of whether the deceased insured intended, in answering the application, to deceive or defraud the insurance company is an issue which could not be proved or disproved by direct evidence. All of the evidence bearing on this critical issue is necessarily circumstantial and the jury was called upon to draw a conclusion as to intent from the circumstances in which the answer was made.

The applicable rules in this regard have been stated by the Supreme Court in Lynch v. Ricketts, 158 Tex. 487, 314 S.W.2d 273 and in Cavanaugh v. Davis, 149 Tex. 573, 235 S.W.2d 972. In the former, the Court said: "The jury is thus not only the judge of the facts and circumstances proven but may also draw reasonable inferences and deductions from the evidence adduced before it. Its findings may not be disregarded under the provisions of Rule 301, therefore, if the record discloses any evidence of probative value which, with inferences that may be properly drawn therefrom, will reasonably support the same."

In Cavanaugh, above, the Court said: "While proof of an ultimate fact by other relevant facts and circumstances may sometimes be so conclusive even in the absence of direct evidence as to compel a finding of its existence as a matter of law, [citing cases] this will be true only where reasonable minds might not differ as to the inference to be drawn."

In viewing only the points most favorable to the verdict with respect to defendant ap-

pellant's "no evidence points" and in weighing all of the evidence to find whether the verdict is so against the overwhelming weight and preponderance of the evidence as to be clearly wrong [6] with respect to defendant's points on the insufficiency we overrule it in both instances.

There is ample room for reasonable minds to differ as to why deceased made an untruthful answer to the answer to Question 6 from the inferences that might logically be drawn from the evidence. The cases [7] cited by defendant are not pertinent to that at bar as these cases contain false statements by insured who *know* that they have a serious disease and willfully conceal the disease from the company. Here the only logical inference to be drawn is that they did it with the intention to deceive the company. This was not necessarily the case with the deceased. In the first place the deceased had not sought the insurance, it had sought him. He had rejected, in the past, a rated policy that had been offered him by another company. On his visit to Dr. Pearce he was not told that he was in bad health and was told only of the high blood pressure, something that was known to all concerned. The evidence does not present any logical reason why deceased should be concerned about the report Dr. Pearce might make to the defendant company. Certainly reasonable minds can well differ as to why deceased made the untruthful answer. Whether he was embarrassed at telling his family doctor that he had been to see another doctor or for whatever other reason that only the deceased would know, the jury had a right to draw logical inferences from the facts that brought about the act in question.

Likewise we overrule appellant's assignment of error to the judgment of the court

---

6. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660.

7. American National Ins. Co. v. Stevens, Tex.Civ.App., 262 S.W. 833; John Hancock Mutual Life Ins. Co. v. Esparza, Tex.Civ.App., 286 S.W.2d 695; Atlanta

Mutual Ins. Ass'n v. Heard, Tex.Civ.App., 40 S.W.2d 927; Forrester v. Southland Life Ins. Co., Tex.Civ.App., 43 S.W.2d 127; Stipcich v. Metropolitan Life Insurance Co., 277 U.S. 311, 318, 48 S.Ct. 512, 72 L.Ed. 895.

that the deceased did not know that his answer to Question 7(k) was false and that he did not make his answer thereto with an intent to deceive and mislead the company into issuing the policy, or for the purpose of wrongfully inducing the company to issue the policy. Our reasons for rejecting appellant's same point, earlier in this opinion, with respect to materiality will suffice here.

## IV.

We overrule appellant's points of error wherein he complains of the judgment of the trial court in holding that there was any evidence or sufficient evidence to support the jury's finding that deceased had had a recent physical examination and deceased's statement as to medical treatment he was then receiving were not made for the purpose of wrongfully inducing appellant to issue the policy. The evidence and the discussion of the inferences thereto discussed earlier in this opinion apply here.

 Appellant also assigns error to the use of the word "wrongfully" in the special issue submitted by the court. We overrule this objection as the submission of this issue was just another form of submission of the ultimate issue of intent to deceive the insurer which was incumbent on defendant-appellant to establish under the rule announced in Doyle, above.

## V.

We overrule appellant's assignments of error to the issues submitted by the court requiring an intent to deceive and to the inclusion by the court of the word "wrongfully" in certain special issues. It is appellant's contention that Allen, discussed above, requires that the issues submitted in a case such as this should inquire as to whether the acts of the insured were "for the purpose of inducing * * * Life Insurance Company to issue the policy in question." That Allen overruled Doyle which required an intent to deceive. Our reasons for overruling appellant here are the same as the reasons given above in our discussion of Allen and Doyle. We add, in this respect, that while appellant's requested issue framed in the manner allegedly required by Allen may have been a correct presentation of the issue in question, it is not the only manner of submitting the question and that a correct submission was presented the jury by the trial court.

We overrule appellant's assignments of error and affirm the judgment of the trial court.

ARCHER, C. J., not participating.